<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SYLVIA M. GONZALEZ,<br><br>               Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner<br>of Social Security,<br><br>               Defendant. | Case No.:  2:17-cv-07098 (PAZ)<br><br>**OPINION** |

**APPEARANCES:**

JAMES LANGTON
LANGTON & ALTER, ESQS.
1600 ST. GEORGES AVENUE
RAHWAY, NJ  07065
      On behalf of Plaintiff

DINA WHITE GRIFFIN
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET, SIXTH FLOOR
PHILADELPHIA, PA  19123
      On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Sylvia M. Gonzalez for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.) and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. §§ 1381, et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the applications; Defendant, the Commissioner of Social Security ("the

Commissioner"), opposes Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled, and remands the case in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

In March 2012, Plaintiff filed applications for DIB and SSI alleging a disability onset date of January 26, 2010.  (R. 280-87.)[2]  On July 12, 2012, the Commissioner determined that Plaintiff was not disabled and denied the applications.  (R. 88, 103.)  Plaintiff filed for reconsideration, and the applications were again denied on February 24, 2013.  (R. 118, 131.)  On April 4, 2014, an Administrative Law Judge held a hearing on Plaintiff's applications; Plaintiff was represented by counsel at the hearing.  (R. 63-87.)  On June 13, 2014, the ALJ issued a decision denying Plaintiff's applications.  (R. 144-58.)  On February 2, 2016, the Appeals Council issued a remand order compelling the ALJ to reconsider the decisional findings in several respects.  (R. 159-64.)  On May 13, 2016, the same Administrative Law Judge held a second hearing during which Plaintiff was again represented by counsel.  (R. 29-62.)  On June 24, 2016, the ALJ issued a decision denying Plaintiff's applications.  (R. 12-28.)  On July 15, 2017, the Appeals Council denied

---

[1] In March 2018, the U.S. Government Accountability Office informed the President of its determination that Nancy Berryhill had exceeded the time limit under the Federal Vacancies Reform Act of 1998 allowing her to serve as the Acting Commissioner of the Social Security Administration without the nomination of a successor.  Accordingly, Ms. Berryhill stepped down as Acting Commissioner and continued to lead the agency from her title of record as Deputy Commissioner for Operations.  *Id.*  In April 2018, Ms. Berry resumed her role as Acting Commissioner.  *Patterson v. Berryhill*, No. 18-cv-193(DWA), 2018 U.S. Dist. LEXIS 99486 (W.D. Pa. Jun. 14, 2018); *see* 5 U.S.C. § 3346(a)(2).

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 5.

Plaintiff's request for review (R. 1-6), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  On September 14, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3).  ECF No. 1.  On May 9, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 9.[3] The case was reassigned to the undersigned Magistrate Judge on December 24, 2018.  ECF No. 18.

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for DIB and SSI.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion."

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

*Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use language or adhere to a format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482. Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

### B.    Standard for Awarding Benefits

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for DIB or SSI based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1505(a), 416.905(a).[4]  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Thus, an impairment can be established by objective medical evidence from an acceptable medical source but cannot be established by a statement of symptoms, a diagnosis, or

---

[4] Although the standards for disability are the same for both DIB and SSI, these are separate government programs subject to different qualification requirements.

a medical opinion. *Id.* §§ 404.1521, 416.921.

The process for determining an adult's claim for DIB or SSI involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id.* §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all of the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit. *Id.* §§ 404.1572(a) & (b), 416.972(a) & (b). If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities. An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

limitations.  *Id.* §§ 404.1522, 416.922.  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence.  *Id.* §§ 404.1526(b)(2), 416.926(b)(2).  If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled as long as the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months.  *Id.* §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work.  20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date.  In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *Id.* §§ 404.1560, 404.1565, 416.945, 416.960.  If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id*. at §§ 404.1569a(a) & (b), 416.969a(b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing manipulative or postural functions such as reaching, handling, stooping, climbing, crawling, or crouching; difficulty tolerating physical features of certain work settings such as dust or fumes; or difficulty maintaining concentration or understanding detailed instructions. *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a

framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. §§ 404.1569a(d), 416.969a(d).   If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id*. §§ 404.1569a(c), 416.969a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 33 years old on the alleged onset date (January 26, 2010), and her date last insured is December 31, 2020.  (R. 17, 21.)  At Step One of the decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (R. 17.)  At Step Two, the ALJ found that Plaintiff had the following severe impairments:  degenerative disc disease, status post cervical disectomy and fusion; degenerative joint disease of the knees; right knee meniscal tear; affective disorder; and anxiety.  (R. 17.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that were severe enough to meet or medically equal the severity of any Listing.  (R. 18-19.)  At Step Four, the ALJ found that Plaintiff had the RFC to perform sedentary work, except that she could perform all postural functions occasionally, could frequently reach, and could understand, remember, and carry out simple instructions.  (R. 19-21.)  The ALJ also found at Step Four that Plaintiff was unable to perform her past relevant work as a manager, executive assistant, or census worker.  (R. 21.)  At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 202.28 if Plaintiff had the RFC to perform the full range of sedentary work.  The ALJ also found at Step Five that at least 3 jobs – assembler, order clerk, and document preparer – existed in significant numbers in the national economy that could be performed by an individual with Plaintiff's age, education, work experience, and RFC.  (R. 22.)  The ALJ therefore concluded that Plaintiff was not disabled at any time between the alleged onset date and the decision date (June 24, 2016).  (R. 22-23.)

Plaintiff's brief contains three argument sections.  First, Plaintiff contends that the ALJ's Step Three analysis "is not based on substantial evidence."  ECF No. 11 at 13.  Second, Plaintiff contends that at Step Four "the RFC is announced without evidentiary rationale, without recounting Plaintiff's hearing testimony, without assessing Plaintiff's pain or mentioning her regimen of opiod medication, and without indicating what evidence supports any of Plaintiff's abilities or limitations."  *Id.* at 22. Third, Plaintiff contends that at Step Five "the Commissioner did not carry her burden."  *Id.* at 34.  Plaintiff requests that the case be remanded for payment of benefits or alternatively for a new hearing.  Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.    SUMMARY OF RELEVANT EVIDENCE[6]

### A.    Medical Evidence Before The ALJ.

#### 1.    Treating Providers.

An MRI of Plaintiff's lumbar spine performed February 26, 2006 revealed disc bulging at L4-L5 and L5-S1 impressing on the anterior thecal sac at these levels.  (R. 385.)

An MRI of Plaintiff's left knee dated April 25, 2006 revealed:  a grade 2 intrameniscal tear within the posterior horn of the medial meniscus; and grossly intact cruciate and collateral ligaments.  (R. 386.)

---

[6] Local Civil Rule 9.1 requires that a plaintiff's brief include both a separate statement of the case (that indicates briefly the course of the proceeding and its disposition at the administrative level) and a statement of facts (with reference to the administrative record).  Local Civ. R. 9.1(e)(5)(B)-(C).  Plaintiff's 38-page brief contains a 1-paragraph section entitled "Procedural History/Statement of Facts" that does not cite a single piece of record evidence.  ECF No. 31 at 1-2.  This omission seriously hampers the Court's ability to understand and analyze Plaintiff's arguments.  It is a failing that should not be repeated by Plaintiff's counsel in future submissions to the Court.

An MRI of Plaintiff's cervical spine performed September 8, 2006 revealed: central and left-sided disc herniation at C6-C7 impressing on the anterior thecal sac and moderately narrowing the neural foramina at this level, especially on the left; disc bulging at C5-C6 moderately impressing on the anterior thecal sac at this level; slight disc desiccation; and straightening and reversal of the normal cervical lordotic curvature consistent with muscle spasm. (R. 387.) An MRI of Plaintiff's right knee performed the same date revealed: a grade 2 intrameniscal tear within the posterior horn of the medial meniscus; and grossly intact cruciate and collateral ligaments. (R. 388.)

An MRI of Plaintiff's cervical spine performed June 2, 2008 revealed: a small posterior ridge with central subligamentous disc herniation at C6-C7 moderately impressing on the anterior thecal sac and mildly narrowing the neural foramina at this level; moderate hypertrophic changes with disc space narrowing at the C6-C7 level; and straightening and reversal of the normal cervical lordotic curvature consistent with muscle spasm. (R. 389.)

In February 2009, Dr. Donald H. Frank signed a letter that read:

[Plaintiff] is under my care for the follow-up care for surgery, which I performed on 9.24.08. She had an anterior cervical discectomy and fusion and an arthroplasty at a second level. She is to remain on total permanent disability and will not be able to return to work. Please note the above patient was in a car accident on 6.27.05.

(R. 384.)

An x-ray of Plaintiff's lumbar spine performed May 16, 2012 revealed intact osseous structures, normal lumbar lordosis, and unremarkable sacroiliac joints. (R. 392.) An x-ray of Plaintiff's bilateral knees performed the same date revealed intact bilateral osseous structures and preserved joint spaces. (R. 390.) An x-ray of Plaintiff's cervical spine performed the same date revealed: straightening of the normal cervical lordosis; post-operative changes at C6-C7 level with

severe and increased osteophyte formation; intact osseous structures; and no prevertebral soft tissue swelling.  (R. 391.)

An MRI of Plaintiff's lumbar spine performed October 29, 2013 revealed:  a broad-based posterior bulge of the L4/5 intervertebral disc impinging upon the thecal sac causing mild stenosis of the bilateral neural foraminae; a 1.2 cm hemangioma in the L3 vertebral body medullary space; no stenosis of the spinal canal; and no evidence of herniation of the L5-S1 intervertebral disc.  (R. 413, 416.)  An MRI of Plaintiff's right knee performed the same date revealed:  preserved medullary space signal intensity; no dislocation; intact ACL, PCL, MCL and the lateral and collateral ligamentous complex; no identified soft tissue mass; no tear in the lateral meniscus; a large knee joint effusion; and a longitudinal tear of the body of the medial meniscus for which clinical correlation was recommended.  (R. 414.)  An MRI of Plaintiff's left knee performed the same date revealed:  preserved medullary space signal intensity; no dislocation; intact ACL, PCL, MCL and the lateral and collateral ligamentous complex; no identified soft tissue mass; no evidence of meniscus tear; no identified focal internal derangement; and a large knee joint effusion for which clinical correlation was recommended to evaluate for the presence of associated inflammation.  (R. 415.)

An MRI of Plaintiff's lumbar spine performed December 13, 2013 revealed:  central and right-sided disc herniation at C5-6 impressing on the anterior thecal sac, narrowing the right neural foramen, and impinging on the right-sided nerve root at this level, with slight disc dessication – but with no significant cord compression or gross widening of the cervical cord; postsurgical changes with fusion and metallic hardware at the C6-7 level; and straightening of the normal cervical lordotic curvature consistent with muscle spasm.  (R. 418.)

In March 2014, Dr. Michael Baer signed a letter that read:

> I am treating [Plaintiff] for injuries she sustained in a [motor vehicle accident] on 9/2/13 in which she sustained injuries to her neck, low back and right and left knees. I performed a recent re-exam on her on 3/14/14 where she still complained of the above pain symptoms and had positive findings to confirm her complaints. On MRI[]s she shows a herniated C5-C disc in her neck, a bulging L4-L5 disc in her low back, a large swelling in her left knee and a longitudinal tear of the medial meniscus with swelling in her right knee. She said to me on 3/14/14 that her left knee pain has been more than the right. She said she is taking daily pain meds to make her knee pains bearable.

(R. 417.)

Plaintiff's pharmacy generated a Customer History Report for the period between March 2014 and May 2016. (R. 380-81.) Prescribing providers were Luis Benalczar, Ericka Rivera, and Nivia Rowe. Recurrent prescribed medications were: Clonazepam (mental health); Xanax/Alprazolam (mental health); Zoloft/Sertraline HCL (mental health); Flexeril/Cyclobenzaprine (pain); Naproxen (pain); Oxycodone (pain); Oxycodone with Acetaminophen (pain); Voltaren/Diclofenac Sodium (pain); Metformin (diabetes); Victoza (diabetes); Flovent (asthma); Singulair/Montelukast (asthma); and Ventolin/Albuterol (asthma).

## 2. Non-Treating Providers.

In May 2012, Plaintiff underwent a consultative examination with Dr. Arden Fusman. (R. 398-404.) Plaintiff stated that she experienced neck and back pain following a car accident years ago; had a cervical spine fusion in 2008; experienced severe bilateral knee pain, worse on the right; experienced discomfort in all positions, which made it difficult to sit, stand, or lie down for long periods of time; was constantly moving; and took OxyContin (Oxycodone), Flexeril (Cyclobenzaprine), and Naproxen (Naprosyn). Plaintiff also complained of anxiety. Dr. Fusman's physical examination findings included:

> [Plaintiff's] range of motion is slightly limited in knee, flexion and extension right 0-120 and left 0-140 degrees. Cervical spine lateral flexion right 30 degrees and left 30 degrees, flexion right 30 degrees and left 30 degrees, extension right 20

14

degrees and left 20 degrees, rotation right 50 degrees and left 50 degrees. Lumbar spine flexion and extension 0-60 degrees, lateral flexion right 10 and left 10 degrees. Her straight leg raising test was negative bilaterally both sitting and supine. She can squat third of the way down. She can walk on her heels and she can walk on her toes. Her sensation and reflexes are normal. Strength is 5/5. She has a mildly antalgic gait on the right, but knows she does not use any assistive device. She is moderately limited in her ability to walk and stand, moderately to severely limited in her ability to lift and carry, and moderately to severely limited in her ability to bend, crouch, and stoop. Her vision and hearing appear to be intact, but were not formally tested.

(R. 399.)  Dr. Fusman offered the following assessment:

At this time, this is a 35-year-old Hispanic female with a history of prior motor vehicle accident and cervical spine fusion in 2008 at C6-C7 level. She now has a limited range of motion of her cervical spine. She also has bilateral knee pain most likely secondary to degenerative joint disease, although her x-rays appear to be normal. On physical exam of the knee, she has mild-to-moderate crepitus in the right knee. Her range of motion of both knees are good and minimal to moderate tenderness in the right knee as well. She also complains of anxiety, which limits her ability to perform work activities.

(R. 399-400.)

Also in May 2012, Dr. Fusman completed a Passive Range Of Motion Chart. He opined that Plaintiff had normal range of motion in her shoulders, elbows, wrists, hips, and ankles. On a scale of 0-150, her right knee flexion extension was 120 degrees, and left was 140 degrees. On a scale of 0-45, her right and left cervical spine lateral flexion was 30 degrees. On a scale of 0-50, her right and left cervical spine flexion was 30 degrees. On a scale of 0-60, her right and left cervical spine extension was 20 degrees. On a scale of 0-80, her right and left cervical spine rotation was 50 degrees. On a scale of 0-90, her lumbar spine flexion-extension was 60 degrees. On a scale of 0-25, her right and left lumbar spine lateral flexion was 10 degrees. Plaintiff had bilateral negative straight leg raising test results in both the supine and sitting positions. She was able to squat one-third of the way to the floor; she was able to walk on both heels and toes; and she had no sensory or reflex loss on either side. Her bilateral muscle strength was 5 (with 5 being

normal). Dr. Fusman noted that Plaintiff could not walk at a reasonable pace but did not use a hand-held assistive device. (R. 402-03.)

In June 2012, Plaintiff underwent a consultative examination with Dr. Pradip Gupta. (R. 405-07.) Plaintiff stated that she was currently on welfare; had been unemployed since 2010; and lived in a house with her two children and boyfriend, whom she alleged was a violent drug abuser who physically and mentally abused her. As to her physical impairment history, Plaintiff stated that she had been in a car accident in 2005; had "cervical fusion and herniated disk on the neck" in 2008; suffered from back, knee, and neck pain; and took Roxicodone (Oxycodone) and Nexavar (Sorafenib). Dr. Gupta summarized Plaintiff's recitation of her mental impairment symptoms and history as follows:

> The patient also gets frequent crying episodes and gets into anger and feels violent, rage. She says she can control by come down and get isolative and withdrawn [sic]. The patient feels depressed most of the time of the day and also feels decrease[d] level of interest, also social adjustment problems, short-term memory problems, attention and concentration difficulties, sleeping difficulties, sleeping problems. The patient is not under care of psychiatrist at this time. There is no history of psychosis. The patient gives history of frequent mood swings, anger, hostility, and difficulty controlling impulses. The patient says she was also under care of psychotherapist. Currently not on any medication. The patient denies any history of any suicidal attempt or suicidal problems.

(R. 405.) Dr. Gupta's mental status evaluation findings included:

> [Plaintiff] can sit down and carry on conversation on topic; however, the speech was also pressured and excessive and at times was circumstantial and irrelevant. The patient[] knows today's date, year, month, and season. The patient knows the current US President name Obama and she can tell a few US president names correctly before [P]resident Obama. She knows the average distance from New Jersey to New York and travel time from New Jersey to New York. She knows US capital[] names and can name some big cities in USA. Her general fund of knowledge informations are fair. Abstracts and reasonings, she can do common abstracts between apple and pear and pen and pencil. She was not able to do proverb interpretation. Attention and concentration, the patient can spell "world" forward and backward. The patient's digit span was 5 digits forwards and 4 digits backwards. Serial 7 was difficult and not able to complete. Serial 10 was okay. Insight was present, but limited. Intelligence and judgment, she was asked what would she do if there is a fire in the house, she says she will try to take the children

out and call 911.  If she was walking outside the street and found an addressed envelop[e] with a stamp on it what would she do, she says she will put in the mailbox.  Memory, immediate recall was 3/3, in 3 minutes 3/3 and in 5 minutes 3/3.  Her past and remote memory were fair.  Mood was moderately depressed and also appears to [be] agitated.  Affect was somewhat constricted.  Can follow 3-step command.  There is no psychosis noted.  No suicidal thoughts.

(R. 406.)   Dr. Gupta diagnosed mixed anxiety depression disorder and possible bipolar disorder, and he assessed a GAP of 55.  He did not offer an opinion regarding any functional limitations.

Instead, he offered the following "comment:"

The patient came here by driving car.  She can drive a car.  She can take public transportation on her own.  She lives with her children in a house in Perth Amboy.  She can dress, bath, and groom herself.  Doing household chores are difficult because of pain, mother helps.  Sometimes she can cook simple meals, can do laundry.  She can use a computer.  She can read and write.  She does participate in hobbies.  Does socialize.  She stays home whenever [sic] and send the children to school and then takes care of the household things and also kids.  She has been going to pain management for her injuries and pain.  Currently, the patient can handle simple money matters at a time.

(R. 406-07.)

### 3.    Non-Examining Providers.

In July 2012, State Agency reviewing consultants opined that:

- Plaintiff did not meet Listing 1.04 (Disorders Of The Spine).

- Plaintiff could frequently lift/carry up to 10 pounds; could occasionally lift/carry up to 20 pounds; could stand and/or walk (with normal breaks) for a total of 4 hours; could sit (with normal breaks) for a total of 6 hours in an 8-hour workday; must periodically alternate sitting and standing to relieve pain and discomfort; had unlimited pushing/pulling ability; could frequently climb ramps/stairs and balance; and could occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl.

- Plaintiff did not satisfy the Paragraph A criteria for Listing 12.06 (Anxiety-Related Disorders).

- Plaintiff did not satisfy the Paragraph B criteria for Listing 12.06 because she had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation each of extended duration.

- Plaintiff did not satisfy the Paragraph C criteria for Listing 12.06.

- Plaintiff was not significantly limited in her ability: to remember locations and work-like procedures; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; and to set realistic goals and make plans independently of others.

- Plaintiff was moderately limited in her ability: to understand, remember, and carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation.

- Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions.

The consultants concluded that Plaintiff could "sustain focus, memory, basic social interaction, and mental pace/persistence for simple, routine tasks." (R. 89-102, 104-17.)

In February 2013, State Agency reviewing consultants reaffirmed these opinions on reconsideration. (R. 119-30, 132-43.)

### B.    Reports/Hearing Testimony.

Plaintiff completed a Function Report in April 2012. (R. 337-44.) She stated that her daily activities consisted of cleaning up around the house (with her daughter's help) and cooking. Plaintiff spent about 15 minutes to 1 hour preparing simple meals. Plaintiff's only identified personal care problems were tying her shoes and shaving her legs because it was difficult to bend. She also found it hard to do laundry, yardwork, and household repairs because of difficulty bending. The family had no pets. Plaintiff went outside every day, drove, and rode public

transportation. She went shopping twice a month and could handle finance matters. She used to run for exercise but now spent time watching television and reading. She spent time with others about 3 times a week and noticed that she was getting more isolated because of sluggishness. Her neck hurt when she slept, and she was always tired from not sleeping well. Plaintiff noted that she had problems getting along with people because she was cranky. She used to be able to sit and stand for long periods. Due to her impairments, she has problems sitting, standing, climbing, squatting, walking, kneeling, lifting, and bending. She could not stay in one position for more than an hour without needing to move around. She did not know how long she could walk without needing to stop and rest for 15 minutes. She sometimes used a cane for walking, but the cane was not prescribed by a doctor. Her doctor prescribed a knee brace about 4 years ago, which she continued to wear when her knee hurt. She had problems concentrating and completing tasks but did not have problems following instructions. She did not handle stress well and was fired from her most recent job because her supervisor did not like her.

Plaintiff completed another Function Report in November 2012. (R. 363-70.) The Court notes several additions to and changes from her April 2012 Report. Plaintiff stated that she took her children to school every day after feeding them breakfast. She went to physical therapy 3 times a week. She did not spend more than 5-10 minutes cooking each day. Plaintiff's mother came over to help clean the house. Plaintiff also had difficulty bathing and using the toilet. Plaintiff fed the dogs, but her daughter walked them. Plaintiff drove a car every day and could go out by herself, but her mother and daughter did all the shopping. Plaintiff spoke to friends on the phone every day and had no problems getting along with other people. Her neck and knee pain continued to interrupt her sleep. She could walk 1.5 blocks before needing to stop to rest. She handled stress okay but had difficulty handling changes in routine, which is why she saw a psychologist. She

identified as unusual behavior that she was feeling very depressed. She had never been laid off from a job.

Plaintiff testified during the September 2016 hearing in response to questions from the ALJ and her counsel. (R. 3-52.) She described feeling as if she had to hold her neck up all the time. She experienced discomfort when turning her head to look from side to side and when tilting her head down. When at home, she used "one of those old makeshift collars" to support her neck. She had constant pain across her lower back that reached down into her buttocks like a "forever pulled muscle." Both her knees were painful, but the left was worse than the right. The most comfortable position for her was sitting and leaning back with her legs elevated like on a chaise lounge. She could stand for about 15 minutes before feeling pain in her knees and lower back. Her knees and back would hurt and her neck would begin to feel heavy after she walked about 2-3 blocks. Sitting for longer periods of time also hurt her lower back and her knees. She could not lift a gallon of milk without feeling pain in her back and neck. She would have problems with her neck if, for a 6-8 hour workday, she had to sit at a table, lean forward in a chair, and move or lift different objects. She could glance down briefly but, to read, she needed to lay down and hold the reading material parallel to her body; she described the best scenario as where she was holding the reading material as if she were laying in a planetarium and reading from the ceiling. Plaintiff was being treated for depression and anxiety. She used to take Xanax but "wanted something that wasn't considered more of – such of a drug, so-to-speak." Plaintiff's sister, who is a nurse, recommended Klonopin, which was subsequently prescribed by Dr. Bentacarza, Plaintiff's primary care physician. Plaintiff attributed her depression to her 2008 surgery because she could no longer do things like run, squat, or play with her kids. She described a "damned if I do, damned if I don't scenario" because the Klonopin helped her depression but made her lethargic, which in turn made her anxious.

## V.    DISCUSSION

### A.    <u>Step Three.</u>

At Step Three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of" any Listing, including Listings 1.02 (Major Dysfunction Of A Joint), 1.04 (Disorders Of The Spine), 12.04 (Affective Disorders), and 12.06 (Anxiety Related Disorders).[7]  (R. 18.)  Plaintiff contends that the ALJ committed two reversible errors at Step Three.  Specifically, Plaintiff argues that "the decision neither adequately compares evidence of individual impairments with the requirements of any specific listing, nor does it combine all impairments for a discussion of medical equivalence."  ECF No. 11 at 17.  The Court addresses each argument below pursuant to the Third Circuit's instruction that the ALJ need not "use particular language or adhere to a particular format in conducting [Step Three] analysis" so long as "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for any [L]isting."  *Jones*, 364 F.3d at 505 ("the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").  Accordingly, the Court will review all evidentiary discussion(s) regardless of placement in the ALJ's decision.  *See Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146-47 (3d Cir. 2007).

### 1.    Listings 1.02 and 1.04.

Listing 1.02 provides:

Major dysfunction of a joint(s) (due to any cause):  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion

---

[7] The Court analyzes all Listing criteria, as did the ALJ, as of June 24, 2016, the date of the ALJ's decision. The applicable criteria are described in Social Security Administration Program Operations Manual System ("POMS") DI 34121.011, *Musculoskeletal Listings from 06/16/2008 to 09/28/2016*, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0434121011, and POMS DI 34132.009, *Mental Listings from 12/18/07 to 09/28/16*, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0434132009.

or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.    Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

OR

B.    Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00 B2c.

POMS DI 34121.011.  The ALJ found that Plaintiff's "degenerative joint disease of the knees bilaterally, and right knee meniscal tear, do not rise to the level of meeting medical listing 1.02 given that the evidence does not demonstrate significant gross anatomical deformity resulting in an inability to ambulate effectively."  (R. 18.)  Plaintiff asserts that the ALJ's finding ignores "that a right knee MRI revealed meniscus tearing and joint effusion *corroborating* complaints of ambulation problems and knee bending."  ECF No. 11 at 21 (emphasis in original).  But Plaintiff's reliance on this evidence is misplaced.   Under Listing 1.00 B2b, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  *Id.*[8]  None of the evidence referenced in the ALJ's decision suggests that Plaintiff can ambulate only with the use of a handheld assistive device that limits the functioning of both her upper extremities.

Listing 1.04 provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

---

[8] Listing 1.00J requires an examination of the claimant's ability to ambulate without the assistive device(s) in place.  *See* POMS DI 34121.011.

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00 B2b.

POMS DI 34121.011.  The ALJ found that Plaintiff's "back disorder does not rise to the level of meeting the spinal stenosis, nerve root, or spinal cord compression requirements of medical listing 1.04 (with the attendant sensory or reflex loss, spinal arachnoiditis or pseudoclaudication), and is not supported by the necessary diagnostic and clinical evidence."  (R. 18.)  Plaintiff asserts that the ALJ's finding ignores:  the 2006 MRI of her lumbar spine that revealed disc bulging impressing on anterior thecal sac (R. 385); the 2006 and the 2008 MRI of her cervical spine that revealed disc herniation impressing on anterior thecal sac (R. 387, 389); the 2013 MRI of her lumbar spine that revealed disc bulging impinging on thecal sac causing mild stenosis of bilateral neural foraminae (R. 413); and the 2013 MRI of her cervical spine that revealed disc herniation impressing on anterior thecal sac and impinging on right-sided nerve root (R. 418).  ECF No. 11 at 20-21 (citing R. 20).  Even if this evidence demonstrated the requisite nerve root compression or lumbar spinal stenosis to invoke Listing 1.04A or 1.04C, respectively, none of this evidence – nor any other

evidence – satisfies the remaining Listing criteria.[9]  As to Listing 1.04A, Dr. Fusman opined that Plaintiff had normal bilateral muscle strength, no sensory or reflex loss, and bilateral negative straight leg raising test in both the supine and sitting positions.  As to Listing 1.04C, as explained above, Plaintiff is able to ambulate effectively because she does not require a handheld assistive device that limits the functioning of both her upper extremities.

Plaintiff does not point to any specific record evidence overlooked by the Court that support her argument that Listing 1.02 or 1.04 is met.  The Court therefore finds that substantial evidence supported the ALJ's decision as to these Listings.  Alternatively, the Court finds that any error as to these Listings was harmless.  *See Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 162 (3d Cir. 2008) (affirming Step Three finding where claimant "provides us with no citations to any record evidence demonstrating that her impairments are of Listing-level severity"); *Domkos v. Colvin*, No. 15-cv-2660 (JLL), 2016 WL 1732380, at *3 (D.N.J. May 2, 2016) (remand not warranted when claimant failed to cite evidence that Listing was met because "[i]t is not enough to simply call foul and punt to this Court for research and analysis.").

### 2.    Listings 12.04 and 12.06.

The criteria for paragraphs A and C differ between Listing 12.04 (Affective Disorders) and Listing 12.06 (Anxiety Related Disorder), while the paragraph B criteria are the same for both Listings.  Listing 12.04 is met when the criteria of *both* Paragraphs A and B are satisfied, *or* when the criteria of *only* Paragraph C are satisfied.  Unlike Listing 12.04, Listing 12.06 (Anxiety Related

---

[9] It is not clear that the threshold requirement of Listing 1.04A or 1.04C is met in this case.  Three of the MRI reports relied on by Plaintiff precede her cervical spine surgery in 2008, which preceded her alleged onset date by 2 years.  No MRI revealed stenosis of the spinal cord, and the only express notation of nerve root compression was not until 2013, or 3 years after Plaintiff's alleged onset date.  *Accord Blosser v. Colvin*, No. 14-cv-1308 (MCC), 2015 WL 4410084, at *8 (M.D. Pa. Jul. 20, 2015) (noting no medical evidence of record that encroachment on thecal sac constitutes nerve root compression) (citations omitted); *Swan v. Comm'r of Soc. Sec.*, No. 10-cv-1334 (GTS), 2012 WL 4033720, at *4 (N.D.N.Y. Sep. 12, 2012) (noting disagreement on whether crowding of thecal sac constitutes disagree on whether crowding of thecal sac constitutes nerve root compression).

Disorders) is met when the criteria of *both* Paragraphs A and B are satisfied, *or* when the criteria of *both* Paragraphs A and C are satisfied.  POMS DI 34132.009.  The ALJ found:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

> In activities of daily living, the claimant has mild restriction.  In social functioning, the claimant has mild difficulties.  With regard to concentration, persistence or pace, the claimant has moderate difficulties.  As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

> The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

(R. 18.)

### a)    Paragraph A.

Plaintiff asserts that "the Court must assume that plaintiff met the A criteria of both listing 12.04 and 12.06 since the decision goes on to make findings in the B and C criteria."  ECF No. 11 at 18.  Plaintiff's assertion is incorrect as a matter of fact.  As applicable to Plaintiff's claim, the requirements of Listing 12.04 could have been met by satisfying the requirements of only paragraph C.  Plaintiff's assertion is also incorrect as a matter of law.  It was not necessary for the ALJ to analyze paragraph A having concluded that Plaintiff did not satisfy paragraph B or C as to either Listing.  *See Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 813-14 (3d Cir. 2016);

*Nunez v. Comm'r of Soc. Sec.*, No. 2:14-cv-4664 (KM), 2015 WL 4770991, at *4 (D.N.J. Aug. 12, 2015). Plaintiff does not point to any evidence in the record demonstrating that she satisfied paragraph A as to Listing 12.04 or Listing 12.06. Moreover, whether Plaintiff satisfied paragraph A as to either Listing is irrelevant given the Court's findings below regarding paragraphs B and C.

> **b)    Paragraph B.**

The ALJ's findings that Plaintiff was mildly limited as to both activities of daily living and social functioning mirror the unanimous opinions of the State Agency reviewing consultants. The ALJ, citing both to Plaintiff's Function Reports and hearing testimony, explained that she engaged in a wide range of daily living activities, including: light cooking, cleaning, and shopping (with help from her daughter and mother); most personal care; childcare; and driving. (R. 20.) This is consistent with Dr. Gupta's report that Plaintiff could dress, bathe, and groom herself; cook simple meals; do laundry; care for children; and drive. Plaintiff's report that she spoke with friends on the phone several times each week and took public transportation is also consistent with Dr. Gupta's report that she engaged in socializing. The ALJ could not cite in his decision what did not exist. He was presented with a "treatment record demonstrat[ing] vague mental health complaints with no dedicated treatment from a psychiatrist and psychologist, indicating only psychotropic medication prescribed by" a primary care physician 5 years after the alleged onset date. (R. 21.) Plaintiff does not cite any evidence overlooked by the ALJ in finding a mild limitation as to activities of daily living and social functioning. The Court finds that even if the ALJ's finding as to one or both functional categories was not sufficiently explained in the decision, such error would be harmless because the Court cannot conclude that substantial evidence supports a finding of marked limitation as to either category.

The ALJ's decision that Plaintiff was moderately restricted in concentration, persistence, and pace also mirrors the unanimous opinion of the State Agency reviewing consultants. The ALJ

cited Dr. Gupta's psychiatric consultative examination report, "which indicates that the claimant is capable of performing simple cognitive operations, has fair memory, [and] has the ability to follow three-step commands[.]" (R. 21.) Although Plaintiff points to no conflicting evidence, the Court notes that Dr. Gupta reported that Plaintiff was not able to name many U.S. Presidents, was not able to complete Serial 7s, and could not do proverb interpretation. The Court finds that substantial evidence supports the ALJ's finding of a moderate limitation as to concentration, persistence, or pace. But even if the ALJ had erred by not finding a marked limitation in this functional category, such error would be harmless because Plaintiff did not have a marked limitation in at least one of the other two categories, and because there is no evidence – noted by the State Agency reviewing consultants, cited in the ALJ's decision, cited in Plaintiff's brief, or identified by the Court – that Plaintiff experienced even one episode of decompensation of any length (let alone three episodes, each lasting at least two weeks, within 1 year or an average of once every 4 months).

<em>c)</em>  ***Paragraph C.***

The paragraph C criteria for Listings 12.04 and 12.06 are different. For Listing 12.04, a claimant must establish:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

POMS DI 34132.009.  The first paragraph C criteria for Listing 12.04 is therefore identical to the fourth paragraph B criteria for both Listings 12.04 and 12.06.  Listing 12.06 consists of a single paragraph C criterion:  the claimant must establish a "complete inability to function independently outside the area of one's home."  *Id.*; *see id.*, Listing 12.00F (noting that the Listing 12.06 paragraph C criterion "reflects the uniqueness of agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home").  As discussed above, there is no evidence in the record that Plaintiff had repeated episodes of decompensation, each of extended duration.  The ALJ's decision did not cite any evidence that a minimal increase in mental demands or a change in the environment would cause Plaintiff to decompensate; that Plaintiff has been unable to function outside a highly supportive living arrangement for the last year or more; or that Plaintiff is completely unable to function independently outside her home.  Plaintiff does not cite, nor can the Court identify, evidence overlooked by the ALJ that would demonstrate that any of her impairments meets the paragraph C criteria of Listing 12.04 or 12.06.  The Court therefore finds that substantial evidence supports the ALJ's finding in this regard and, alternatively, that any error in the ALJ's analysis of the paragraph C criteria is harmless.

### 3.    Medical Equivalence.

Plaintiff contends that the ALJ reversibly erred by failing to explain why no combination of her impairments is medically equivalent in severity to any Listing.  Absent such explanation, Plaintiff asks, how can she dispute the finding?  ECF No. 11 at 19, 20.  This rhetorical question belies the two defects of Plaintiff's argument – namely, its failure to deal with burden of proof, and its failure to deal with harmless error.  Judge Chesler explained how these legal principles apply at Step Three in *Bush v. Commissioner of Social Security*, No. 14-cv-2086 (SRC), 2015 WL 3889543 (D.N.J. Jun. 25, 2015):

As to the burden of proof, Plaintiff bears the burden in the first four steps of the

analysis of demonstrating how [her/]his impairments, whether individually or in combination, amount to a qualifying disability.

As to the harmless error doctrine, the Supreme Court explained its operation in a similar procedural context in *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009), which concerned review of a governmental agency determination. The Court stated: "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Id.* In such a case, "the claimant has the 'burden' of showing that an error was harmful." *Id.* at 410.

Plaintiff thus bears the burden, on appeal, of showing not merely that the Commissioner erred, but also that the error was harmful. At the first four steps, this requires that Plaintiff also show that, but for the error, [s/]he might have proven his disability. In other words, when appealing a decision at the first four steps, if Plaintiff cannot articulate the basis for a decision in [her/]his favor, based on the existing record, [s/]he is quite unlikely to show that an error was harmful.

*Id.* at *2; *see Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) ("An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover."). Judge Chesler found that remand was not warranted in that case because the claimant failed to meet her burden of proving that the ALJ's Step Three error was harmful:

Conspicuously absent from Plaintiff's brief is any statement of what Listing Plaintiff contends [s/]he meets or equals. Plaintiff fails to explain how the step three analysis might have been performed differently so as to make a material difference in the disability determination. The Court is not persuaded that the step three analysis was inadequate but, even if it was defective, given that Plaintiff has made no case on appeal that [s/]he met his burden of proof at step three, such defects could not be more than harmless error. Plaintiff has not even pointed to the Listing that [s/]he claims to have met or equaled, much less pointed to evidence of record that might have supported such a determination. As such, Plaintiff has failed to persuade that any possible errors at step three materially harmed [her/]him.

*Bush*, 2015 WL 3889543, at *2 (affirming Step Three finding because remand "would not affect the outcome") (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 1005)). Like the claimant in *Bush*, Plaintiff does not sustain her burden of proving that the ALJ's alleged Step Three error was harmful. Plaintiff fails to identify which impairments, combined, were medically equivalent to what Listing(s) – never mind the supporting record evidence. *See Holloman v.*

*Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (affirming Step Three finding where claimant complained "in vague terms that certain impairments were not properly compared, separately and in combination, to the listings" without identifying "specific avenues for meeting or equaling specific listings that the ALJ should have considered but did not"); *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 93 (3d Cir. 2007) (affirming Step Three finding where claimant did not "point to any medical evidence ignored by the ALJ that would indicate that [claimant's] impairments are equivalent to one of the Listings the ALJ identified"); *Cosby*, 231 F. App'x at 146 (affirming Step Three finding where Plaintiff "does not point to any medical evidence ignored by the ALJ that would show that [claimant's] impairments medically equaled one of the listings"). The Court therefore finds that any error in the ALJ's Step Three finding as to medical equivalence was harmless.

   B.    **Plaintiff's Subjective Symptoms**

   An ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process. *See* 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment that could reasonably produce the alleged symptoms, including pain. Second, the ALJ must evaluate the intensity, persistence or limiting effects of pain or other symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. To do this, the ALJ must determine if objective medical evidence alone supports the plaintiff's complaints; if not, the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5)treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to

relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, 2016 WL 1020935, at *4 (S.S.A. Mar. 16, 2016).[10]

After reciting the above two-step process, the ALJ found: "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and the other evidence in the record for the reasons explained in this decision." (R. 19; *see* R. 20 ("The claimant suffers from pain in different locations, and in particular in her neck, but the record as a whole is inconsistent with her contention that that type of pain would prevent her from performing sedentary, unskilled work.").) Plaintiff asserts that the ALJ reversibly erred by rejecting her pain symptoms "without mentioning *any* of" her testimony or medications. ECF No. 11 at 12 (emphasis in original); *see id.* at 31-34 ("Here, pain is rejected or ignored in the RFC and in the decision."). This is untrue. As noted below, the ALJ's decision stated:

- "The claimant suffers from pain in different locations, and in particular in her neck[.]" (R. 20.)

---

[10] The Court notes that both parties cite Social Security Ruling 96-7p, *Titles II & XVI: Evaluation of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements*, 1996 WL 374186 (S.S.A. Jul. 2, 1996), which was superseded by Social Security Ruling 16-3p. The ALJ applied SSR 16-3p, which became effective on March 16, 2016 and "remove[d] the word 'credibility' from the analysis to make clear that there is no examination of a witness's character, and to hew closer to the regulatory language contained within the relevant C.F.R. provisions." *Pidgeon v. Colvin*, No. 15-cv-2897 (JBS), 2016 WL 2647666, at n.7 (D.N.J. May 9, 2016) (finding that "analysis is the same under either ruling").

- "While the claimant did have cervical surgery in September of 2008 – subsequent to MRI findings indicating cervical disc herniation with impingement – and may understandably be reluctant to undergo further surgery, she has not been receiving any other kind of treatment other than pain relief medications and a brief period of physical therapy."  (R. 20.)

- "Her testimony and function report reflect that, while she gets help for more strenuous household work, she performs basic activities of daily living that do not require prolonged standing or walking."  (R. 20.)

- "The claimant testified that she is still having problems with her neck, lower back and knees."  (R. 20 (citing Plaintiff's testimony that she is limited "to standing about 15 minutes at a time, to walking no more than 2 to 3 blocks, and to sitting for less than 6 hours due to her neck problems").)

Nevertheless, the Court agrees that remand is warranted for a new assessment because the ALJ failed to explain *why* Plaintiff's subjective symptoms are inconsistent with the record evidence. As to the medical evidence, the ALJ stated that "[a] right knee MRI revealed meniscal tearing and joint effusion, corroborating complaints of ambulation and knee bending" (R. 20) – but there is no explanation for why the MRI corroborates less knee pain than Plaintiff alleges.  There is also no explanation for why Plaintiff's alleged back and knee pain is inconsistent with Dr. Fusman's opinion (afforded "great weight" by the ALJ) that she had moderate to severe limitations in her ability to bend, crouch, stoop, lift, and carry.  Nor is there an explanation for why Plaintiff's alleged neck pain is inconsistent with the limited range of cervical spine motion documented in Dr. Fusman's report and chart.  As to the non-medical evidence, the ALJ stated that "[h]er testimony and function report reflect that, while she gets help for more strenuous household work, she performs basic activities of daily living that do not require prolonged standing or walking" (R. 20) – without explaining why her activities of daily living are inconsistent with alleged pain from prolonged sitting or neck movement.  The Court therefore finds that substantial evidence did not support the ALJ's assessment of Plaintiff's subjective symptoms.

### C.      Step Four – RFC Finding.

At Step Four, the ALJ found that Plaintiff had the RFC to perform sedentary work except that she "can perform all postural functions occasionally; can frequently reach; and can understand, remember and carry out simple instructions."  (R. 19.)  Plaintiff contends that the RFC finding is not supported by substantial evidence because it ignores conflicting medical evidence.  The Court agrees as to the RFC limitations involving Plaintiff's physical impairments but disagrees as to the limitation involving Plaintiff's mental impairments.

#### 1.      Physical Impairments.

The ALJ found that "[d]iagnostic imaging supports a finding that the claimant is limited to sedentary work.  Specifically, left knee imaging supports a finding that the claimant is limited to four hours of standing or walking, which substantiates her complaints of knee pain with prolonged standing or walking."  (R. 20.)  Plaintiff argues that diagnostic imaging supports a finding of less than sedentary work.  ECF No. 11 at 26.  Neither Plaintiff's counsel, nor the ALJ, nor this Court has the expertise to analyze Plaintiff's MRI and x-ray results on a function-by-function level.

Aside from diagnostic imaging reports, there is scant medical evidence in the record.  As the ALJ correctly found, Dr. Frank's 2009 opinion that Plaintiff was permanently disabled following her cervical surgery was not entitled to controlling weight because the treating physician rule applies only to opinions that reflect judgments about the nature and severity of a claimant's impairment.  20 CFR §§ 404.1527(a), 416.927(a); *see* 20 CFR 404.1527(d), 416.927(d) ("opinion" that claimant is disabled and unable to work is administrative finding reserved for Commissioner).  Nor did the ALJ err by ascribing "little weight" to Dr. Frank's conclusory opinion, which is both unsupported by treatment records and inconsistent with the opinions of Drs. Baer and Fusman.  (R. 21.)  Although the ALJ's decision does not mention Dr. Baer, the Court finds that this omission is harmless error because Dr. Baer offered no opinion as to Plaintiff's functional limitations.  The

Court also finds that the ALJ did not err by ascribing "little weight" to the opinions of the State Agency reviewing consultants that Plaintiff was capable of performing light work, because those opinions were rendered nearly 1 year before Plaintiff's most recent MRIs. (R. 20.)

This leaves Dr. Fusman's opinion, to which the ALJ ascribed "great weight." The ALJ found that the opinion "supports a wide range of sedentary work consistent with the residual functional capacity herein." (R. 20.) The ALJ's decision stated:

> [Dr. Furman's] examination demonstrated slightly limited ranges of motion of the knees bilaterally (with mild-to-moderate crepitus of the right knee and attendant tenderness), and moderate range of motion limitations of the cervical and lumbar spine. Significantly, straight leg raising was negative bilaterally, the claimant was able to squat a third of the way down and walk on her heels and toes, her sensation and reflexes were normal, she presented with full strength of all extremities, and she presented with a mildly antalgic gait on the right. She was found to have moderate limitations in her ability to walk and stand, moderate to severe limitations in her ability to lift and carry, and moderate to severe limitations in her ability to bend, crouch and stoop.

(R. 21.) Dr. Furman did not opine that Plaintiff had any limitations in her ability to sit. The Court is troubled, however, that the ALJ did not address – or seek to develop the record regarding – whether the medical evidence and Plaintiff's pain complaints indicated a need to change positions. *See* Social Security Ruling 96-9p, *Titles II & XVI:  Determining Capability To do Other Work – Implications Of A Residual Functional Capacity For Less Than A Full Range of Sedentary Work*, 1996 WL 374185, at *7 (S.S.A. Jul. 2, 1996) ("The RFC must be specific as to the frequency of the individual's need to alternate sitting or standing."). The Court is also troubled in several respects that the RFC limits Plaintiff to occasional performance of unspecified "postural activities." Postural activities include:  climbing ladders, ropes, or scaffolds; balancing; kneeling; crawling; stooping (bending the body downward and forward by bending the spine at the waist); and crouching (bending the body downward and forward by bending both the legs and the spine). *See id*. Dr. Furman opined that Plaintiff is moderately to severely limited in bending, stooping,

and crouching.  There is no explanation in the ALJ's decision for why occasional stooping and crawling is consistent with a moderate to severe limitation.  That explanation is necessary, especially because the RFC limits Plaintiff to sedentary work, which involves *less than occasional* lifting and carrying of up to 10 pounds (*see id*.), and because Dr. Furman opined that Plaintiff is also moderately to severely limited as to those functions.  Finally, Dr. Furman's report literally describes the degree of limitation in Plaintiff's cervical spine, which impact her ability to tilt her head to read and work in a seated position.  These activities are not encompassed within the Commissioner's definitions of bending and stooping – which means the RFC finding does not in any way limit these activities.[11]  The Court therefore finds that substantial evidence does not support the RFC finding as to limitations from Plaintiff's physical impairments.

### 2.    Mental Impairments.

Plaintiff's second Function Report indicated that she was seeing a psychologist, and she testified that her primary care physician prescribes psychotropic medication (which is confirmed by pharmacy records).  Since there were no treatment notes in the record regarding Plaintiff's mental impairments, the ALJ ascribed "great weight" to Dr. Gupta's opinion "that the claimant is capable of performing simple cognitive operations, has fair memory, has the ability to follow three-step commands, and was afforded a GAF of 55."  (R. 21.)  Based on this assessment, the ALJ limited Plaintiff to jobs that require her to understand, remember, and carry out simple instructions.  Plaintiff complains that the ALJ's decision ignored Dr. Gupta's report that Plaintiff could not name many previous U.S. Presidents, could not do proverb interpretations, could not complete Serial 7s, and seemed depressed and agitated.  The Court finds that any error in this regard was harmless

---

[11] Indeed, the VE testified that the hypothetical question limiting Plaintiff only to the decisional RFC did not include potentially dispositive limitations in tilting or moving the head.

because none of the omissions would support more restrictive RFC limitations from Plaintiff's mental impairments.

    **D.**    **Step Five**.

Having found above that the RFC finding is flawed as to Plaintiff's physical impairmemts, the Court need not discuss the ALJ's Step Five findings in that regard. *See*, *e.g.*, *Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005); *Moss v. Comm'r of Soc. Sec.*, No. 13-cv-3365 (JLL), 2014 WL 3673042, at *9 (D.N.J. Jul. 22, 2014). The Court addresses below Plaintiff's contention that the hypothetical questions presented to the VE did not include all of Plaintiff's credibly established limitations resulting from her mental impairments. Specifically, Plaintiff argues:

> It cannot be ignored that here the ALJ's "simple instructions" RFC does not adequately convey "moderate difficulties" in concentration, persistence, keeping pace, keeping a schedule, etc. Here, just as in *Ramirez*, the mental RFC and the VE's answers to the ALJ's hypothetical questions based on that RFC may surely have been different had the actual, specific limitations, uncontradicted in the record, been conveyed verbatim as part of the ALJ's hypothetical.

ECF No. 11 at 30 (citing *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004)).

Plaintiff's reliance on *Ramirez* is misplaced. Mental limitation findings at Step Three assess whether the claimant is disabled because s/he met or equaled any Listing. The Third Circuit held in *Ramirez* that, although such findings "are not an RFC assessment and that [S]tep [F]our requires a more detailed assessment, it does not follow that the findings [at Step Three] play no role in [S]teps [F]our and [F]ive, and SSR 96-8p, contains no such prohibition." 372 F.3d at 555 (citing Social Security Ruling 96-8p, *Policy Interpretation Ruling Titles II & XVI: Assessing Residual Functional Capacity In Initial Claims*, 1996 WL 374184 (S.S.A. Jul. 2, 1996)). The Third Circuit further held that a VE hypothetical restricting a claimant to work involving "simple one to two step tasks" did not adequately convey in that case the ALJ's finding at Step

Three that the claimant "often" suffered from "deficiencies of concentration, persistence, or pace." *Ramirez*, 372 F.3d at 551, 554 (noting that SSA regulation required ALJ to rate claimant at Step Three on a five-point scale of never, seldom, often, frequent, and constant) (citation omitted). However, the applicable regulation changed after *Ramirez* was decided and now requires a rating on a five-point scale of none, mild, moderate, marked, and extreme. Like the majority of courts in this District that have considered the issue, the Court is persuaded that this change in regulatory framework distinguishes *Ramirez*.[12] Moreover, unlike the RFC finding at issue in *Ramirez*, the ALJ's RFC finding adequately conveyed Plaintiff's limitations as to concentration, persistence, and pace because, as explained above, the record did not support additional limitations. The Court therefore finds that the hypothetical questions posed to the VE regarding limitations resulting from Plaintiff's mental impairments were supported by substantial evidence.

## V.    CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled, and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions and the accompanying Order.

Dated:    March 20th, 2019                     s/ Paul A. Zoss
At Newark, New Jersey                     PAUL A. ZOSS, U.S.M.J.

---

[12] *See, e.g.*, *Pimental v. Colvin*, No. 15-cv-2662 (JLL), 2016 WL 3456919, at *12 (D.N.J. June 21, 2016) (restriction to "simple, routine tasks adequately accounts for moderate limitations in concentration, persistence, or pace"); *Thompson v. Comm'r of Soc. Sec.*, No. 15-cv-2031 (RBK), 2016 WL 2978610, at *5 (D.N.J. May 23, 2016) (restriction to "simple, routine tasks with simple instructions" adequately accounted for "moderate difficulties with concentration, persistence or pace"); *Pidgeon v. Colvin*, No. 15-cv-2897 (JBS), 2016 WL 2647666, at *13 (D.N.J. May 9, 2016) (restriction to "routine and repetitive tasks" adequately accounted for moderate difficulties with concentration, persistence, or pace); *Domkos v. Colvin*, No. 15-cv-2660 (JLL), 2016 WL 1732380, at *9 (D.N.J. May 2, 2016) (restriction to "simple routine tasks" adequately accounted for moderate difficulties in concentration, persistence or pace) (all citing *McDonald v. Astrue*, 293 F. App'x 941, 946 (3d Cir. 2008) (restriction to "simple, routine tasks" adequately accounted for moderate difficulties with concentration, persistence and pace)). *But see Boyle v. Colvin*, No. 12-cv-4724 (FLW), 2014 WL 3556507 (D.N.J. Jul. 18, 2014) (applying *Ramirez* to revised regulatory framework because *McDonald* is an unpublished decision).